No. 34,049

LAURA P. BLACKBURN, *Appellee*, v. THE SECURITY BENEFIT ASSOCIA-
TION, THE SECURITY BENEFIT HOME AND HOSPITAL ASSOCIATION,
and DR. A. E. HIEBERT, *Appellants*.

(86 P. 2d 536)

Opinion filed January 28, 1939.

*Harry Ladbury, J. L. Hunt, Margaret McGurnaghan, John H. Hunt,
George M. Brewster,* all of Topeka, and *Arthur W. Fulton,* of Chicago, Ill.,
for the appellants.

*Roland Boynton, Francis C. Clark,* both of Topeka, and *Boswell F. Reed,*
of Denver, Colo., for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: Plaintiff brought this action for damages for neg-
ligence and malpractice.

The parties made defendant were the Security Benefit Associa-
tion, a fraternal insurance society incorporated under a Kansas
charter, the Security Benefit Home and Hospital Association, an
affiliate of the first-named defendant and likewise incorporated in
Kansas, and A. E. Hiebert and S. R. Boykin, two members of the
medical and surgical staff of the second-named corporation.

For brevity of reference herein these corporations will be desig-
nated the fraternal association and the hospital association, respec-
tively.

Plaintiff filed her first petition against defendants on September
20, 1935, and summons was served on September 23. To this pe-
tition certain motions and a demurrer were filed on October 15, but
not ruled on. An amended petition was filed on January 15, 1936,

on which issues were joined and the cause tried. In it plaintiff alleged that she was a resident of Denver and that she was and for many years had been a member in good standing in the fraternal association and a holder of one of its fraternal benefit insurance certificates on which all premiums had been paid as required; and that she was entitled to all the benefits of membership, one of which was the right of hospitalization as narrated below.

Plaintiff alleged that the fraternal association had some social and fraternal functions, but its principal function was the sale of fraternal benefit insurance, and that the relationship of the holders of its insurance certificates to the first-named association was substantially the same as that of a policyholder to an insurance company. She also alleged that while the hospital association was ostensibly a separate corporate entity, it was controlled by the fraternal association; that its original incorporators were the principal officers of the fraternal association, and at all times the official personnel of the two associations was the same; that the chief function of the hospital association was to serve as an agent and instrumentality of the fraternal association to hold title to certain property in Shawnee county, Kansas, on which homes for aged and infirm members of the fraternal association and orphaned children of members are conducted, and on which a hospital is maintained for the use and benefit of members of the fraternal association.

The amended petition pleaded at length and minutely the corporate and affiliate relationship of the two associations, the details of which may not concern us when we come to consider some more vital features of this appeal.

The defendants, Dr. A. E. Hiebert and Dr. S. R. Boykin, were resident physicians and surgeons of the hospital association at the times mentioned in plaintiff's cause of action. They were salaried members of the hospital staff and not independent practitioners.

Plaintiff alleged that some time in April, 1933, she applied to the Security Benefit Association for admission to its hospital for treatment of some malady of her gall bladder, and for the removal of bunions, and for the resection of her coccyx; that she had never heard of the Security Benefit Home and Hospital Association and had not had any intentional dealings with it. Pursuant to her application she was admitted to the hopsital on April 12; an operation on her gall bladder was performed on April 19; and her bunions were removed and her coccyx resectioned on May 8. These operations were performed by Doctor Hiebert, assisted by Doctor Boykin.

Following these operations, on the night of May 10, plaintiff fell out of bed and fractured the neck of her left femur; but as this accident happened more than two years before this lawsuit was begun, the attendant circumstances had no controlling significance in this action, and no controversial issues arose concerning them.

Plaintiff was a patient in the hospital for five months and ten days —from April 12 until September 22, 1933. During that period she was chiefly under the professional ministrations of Doctor Hiebert and the nurses and attendants who waited on her under his direction. One of those attendants was Roy Musick, who had been employed by the hospital association for some eight years prior to the admission of Mrs. Blackburn as a patient. In 1930 he took lessons in the administration of diathermic treatments, and under the supervision of various doctors in and out of the hospital he had studied books of instruction concerning such treatments. According to the evidence, a diathermic treatment is the heating of local parts of the human body by high-frequency electric oscillations by means of a machine designed for that purpose. Musick had administered about 3,000 such treatments to patients in the hospital before Mrs. Blackburn was admitted in 1933. During her stay in the hospital Musick administered about sixty-five or seventy such treatments to her under doctor's orders.

At the time Mrs. Blackburn fell out of bed and broke the neck of her left femur, the incision which had been made at the extremity of her spinal column to remove part of her coccyx (tailbone), and the incisions made on her feet to remove her bunions, had not had time to heal. These incidents complicated the problem of treating her for the broken femur. First, an X-ray picture was taken to ascertain the precise nature of the fracture. The treatment which followed included the application of splints to immobilize the injured leg, cast boots for both feet and legs as high as the knee, and the application of some device for holding the injured leg to the well leg at a proper distance apart and to keep it to the same length as the well one. The expert testimony speaks of a "traction splint," a "Jones splint," a "Whitman cast," a "Schantz osteotomy," "Brackett operation," a "Smith-Peterson inset," which on occasion are used to repair a broken femur; but it would serve little purpose to restate the evidence on this intricate subject. To the nonprofessional understanding it would seem that because of the unhealed incisions necessitated in the previous operations for which Mrs. Black-

burn had entered the hospital, the usual cast boots and splints were varied somewhat to adapt them to the existing conditions. As time passed adjustments were made in the casts and splints; and according to defendants' evidence (which we merely use to give a sequential narrative, not to give it preferred credence), Mrs. Blackburn suffered greatly and became very nervous. She developed boils, and pus was secreted in the wound at the end of her spine. Defendants' professional testimony also was that plaintiff developed a severe case of sciatic neuritis—but the jury found the latter malady nonexistent. On June 12, 1933, another X-ray picture of her leg was taken, and after consultation with other members of the staff touching Mrs. Blackburn's condition, Doctor Hiebert removed the splint and cast from her leg. This occurred when it had been on the leg only five weeks and four days, whereas all the professional evidence was that ordinarily it should be kept on the broken limb for three months, except when unusual complications required other treatment. To explain the unusual shortness of time the cast had been kept on the leg, Doctor Hiebert testified:

"Between May 11 and June 12, 1933, she was very nervous. She came into the hospital being nervous, and all these symptoms that went to her nervous condition were aggravated; and she had hardly been in the hospital a single night until she required some nerve sedative before she would sleep. With those large operations that had gone before and the complication of breaking her hip, all those things had aggravated her nervous condition so that she would have a great deal of complaint almost all the time, and she was becoming a psychopathic problem. . . . In my usual practice, I keep the cast on the patient about three months, depending on the case. The cast was removed from Mrs. Blackburn's leg because we didn't have any choice about it. It was choosing the lesser of two evils. The patient had very severe pain from sciatic neuritis, which was so bad that she was absolutely intolerant to the pain. It helped to completely upset her mental balance, and she would cry and complain and groan, and wouldn't eat; and we realized that unless we did something about this severe pain, we would probably lose our patient. So after a thorough consultation with the other doctors to know what we were doing, we decided to remove the cast. We substituted for the cast pillows to stabilize the leg, and started treatment for the neuritis. I personally removed the cast."

A number of medical and surgical experts were called as witnesses. To one of these, Dr. W. M. Mills, a hypothetical question formulated in accordance with the evidence favorable to defendants or undisputed, was propounded and answered thus:

"Q. Suppose a woman fifty-six years of age suffered a subcapital fracture of the femur, and that said fracture was reduced and a well leg splint was ap-

plied to said patient, and that by the use of said splint the fragments and the head were maintained in alignment for a period of approximately five and a half weeks. Do you have an opinion whether the attending physician on that patient would be justified in removing that cast at that time because of the fact that the patient suffered from a severe case of sciatica, and her mental condition was such that the physician in attendance believed that she would lose her mind if the cast were not removed? A. Yes, sir.

"Q. State your opinion.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. I think the circumstances called for a modified treatment; and I think that the mental condition and general physical condition of the patient all have to be considered in patients in continuing a treatment by the doctor."

Dr. R. B. Stewart, another medical and surgical expert, testified:

"In an assumed case where a woman fifty-six years of age suffered a subcapital fracture of the femur, and the fracture was reduced and a well leg traction splint applied, and after the cast had been applied for approximately five weeks the patient suffered from a severe case of sciatica, and her mental condition became such that the physician believed that if the cast were left on the patient, the patient would lose her mind, it is my opinion that the physician would be justified in removing the cast from the patient, or removing the fixation."

Cross-examination:

"The last answer was not based altogether upon the proposition that the patient would lose her mind. Any physical condition which threatens the patient; it might be heart trouble, or any one of many things that might influence him. In other words, you have a choice between the patient and the fracture."

Dr. M. E. Pusitz, another expert called as a witness for plaintiff, testified:

"Q. Assuming that the fracture as shown by Plaintiff's Exhibit 33 occurred on May 10, and the picture was taken on May 11, and that the picture taken on June 12 is of the same fracture; and that on the 11th the patient was placed in a Jones modified traction cast; when, would you say, under proper treatment, that cast should be removed? A. I would judge that it would be much longer. There was some form of fixation. He may have used some other method of fixation. You don't have to continue with the Jones splint."

On cross-examination he added:

"In my experience with fractures of the neck of the femur, I have found that sometimes complications arise outside of the hip fracture which make it necessary to remove the cast or whatever apparatus is used for fixation, earlier than I would under other circumstances."

Plaintiff's amended petition charged defendants with various acts of negligence and malpractice which may be summarized thus:

(1) Defendant's doctors placed plaintiff's leg in a cast with such negligence and lack of skill that the cast did not cover the portion of the femur which was fractured, and did not permit the broken portions of the bone to unite.

(2) Following the placing of her leg in the cast plaintiff was given no further treatment for approximately five weeks.

(3) That the diathermic treatments administered to her should have been given by a trained physician, but defendants ordered and permitted them to be given by Roy Musick, an employee attendant not trained either as a physician or nurse, and that "said acts and neglects . . . constituted the grossest malpractice, lack of due skill, and negligence."

(4) "That this [diathermic?] treatment continued as aforesaid for many more weeks, and that under it plaintiff grew continually more ill, and suffered increasingly intense pain both night and day. That, notwithstanding these indications, the defendants negligently and carelessly continued this course of treatment until September 21, 1933, without further investigating the condition of the fracture. That an X-ray picture was taken on September 21, 1933, and disclosed to defendants that the fracture had never united and had not begun to heal when the electrical and manipulation treatments were begun, and had been continually irritated by such treatment, so that much of the bone structure at that point had sloughed away and been absorbed. That said X-ray picture made September 21, 1933, showed to defendants and they then knew that other treatment to rectify this condition and to induce a union of the fracture was immediately and imperatively needed, lest it become impossible ever to heal said fracture and she be permanently crippled and bedridden. That if the defendants had treated her with the degree of care and skill general among hospitals and doctors in the vicinity at that time the fracture could then have been united within a short time, but that they failed and neglected so to treat her. That they negligently and wrongfully concealed from plaintiff her condition and the urgency of her need for other treatment."

(5) "That thereafter . . . defendants turned plaintiff out of the hospital, although the fracture was still not healed and plaintiff was still bedridden, helpless, and in urgent need of immediate ameliorative treatment as aforesaid."

(6) "That the attendant Musick who administered to plaintiff the [diathermic] treatments heretofore described was wholly in-

competent to . . . administer electrical treatments . . . to administer hand manipulative treatment to facilitate the healing of bone fractures. . . . That the defendants, and each of them, were grossly, willfully, and wantonly negligent in employing such a person to administer such treatment to the plaintiff and in ordering and permitting him to do so, and that such negligence was a directly proximate cause of the injuries and damage to the plaintiff as aforesaid."

(7) "That the defendants, Doctor Hiebert and Doctor Boykin, were incompetent to treat and superintend the medical treatment of plaintiff. . . . That the defendant associations and both of them well knew such to be the fact, and so employed the defendant physicians nevertheless, in disregard to the rights, health, and safety of plaintiff. . . . That in so doing the defendant associations and both of them were guilty of gross, wanton, and willful negligence, and that such negligence was a directly proximate cause of the damage to plaintiff as aforesaid."

Plaintiff concluded her petition with a prayer for $21,500 to compensate her for her actual damages and for a further sum of $15,000 as punitive damages.

The defendants filed separate answers, all of which contained a general denial. The defendant associations pleaded with much detail the facts of their separate corporate structure and their charters. The fraternal corporation pleaded its constitution and bylaws and denied that the hospital association was merely its agent and instrumentality. The hospital association alleged that it was a charitable institution and as such it was immune from damage suits.

The cause was tried at length before a jury. At its conclusion the trial court sustained a demurrer to plaintiff's evidence so far as it concerned Dr. S. R. Boykin and dismissed him out of the case. The demurrers of the other defendants to plaintiff's evidence were overruled. Evidence for defendants was adduced, and plaintiff followed with some rebuttal testimony.

The jury returned a general verdict for $12,500 in favor of plaintiff and against both association and Doctor Hiebert, and answered special questions thus:

"1. Did the plaintiff sustain any injuries or damage by reason of unskillful treatment or lack of treatment, while in the hospital of the defendant Security Benefit Home and Hospital Association subsequent to the time she fell out of bed? A. Yes.

"2. If you answer the foregoing question in the affirmative, then state

(a) of what such unskillful treatment or lack of treatment consisted, and (b) which employees of the Security Benefit Home and Hospital Association were guilty of such lack of skill or treatment. A. (a) Allowed and aided activities not properly supervised, which could not have maintained immobilization shown to be necessary, by the evidence, after removal of the fixation cast used, such as the use of crutches, in and out of wheel chair, and failure to keep proper check on the progress or lack of progress of patient. (b) Doctors S. R. Boykin and E. A. Hiebert; and hospital employees attending the patient, including Roy Musick.

"3. At the time the cast was removed from the plaintiff was she suffering from any ailment other than the fracture of the femur and the previous operations? A. No.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"5. Did the plaintiff leave the hospital of her own accord; or at the request or direction of any of the defendants, their agents, or servants or employees? A. By request or direction of the doctors.

"6. If you find that the plaintiff was requested or directed to leave the hospital by any of the defendants, their agents, servants or employees, then give the name or names of such parties. A. Doctors S. R. Boykin and E. A. Hiebert."

Defendants filed various post-trial motions. All of them were overruled except the motion for a new trial, which the trial court also denied on condition that plaintiff file a remittitur of $6,000 from the verdict of $12,500. Plaintiff assented to such remittitur, and judgment was entered for plaintiff and against the two associations and Doctor Hiebert.

Defendants appeal with a formidable assignment of errors, fifty-five in number, to be exact. These involve rulings on intricate questions of law, including the nonliability of the hospital association as a charitable institution, errors in admission and exclusion of evidence, a dearth of evidence to support the material allegations of plaintiff's petition, special findings of the jury not supported by evidence, special findings of the jury as to negligence and malpractice not those alleged in the petition, and the statute of limitations.

It needs hardly be said that it does not need a specification of half a hundred errors to reverse a judgment. One is quite enough if it is obviously material and prejudicial and if it is clearly established by the record.

One outstanding question which has been apparent in this lawsuit from first to last is the relevancy of the statute of limitations. An action for damages for negligence and malpractice is barred

in two years from the commission of the act or acts complained of. (Civ. Code, Sec. 17, G. S. 1935, 60-306, *Third.*)

Plaintiff left the hospital on September 22, 1933. She filed her original petition for damages on September 20, 1935, and summons was served on the defendants on September 23, 1935. Under our practice an action is considered as begun when the petition is filed if a summons of the same date is promptly served. (*C. K. & W. Rld. Co. v. Comm'rs of Chase Co.,* 42 Kan. 223, 21 Pac. 1071; *Modern Woodmen v. Bauersfeld,* 62 Kan. 340, 62 Pac. 1012.) Here, as service of summons dated September 20, 1935, was effected promptly, we hold that the action was begun on that date. Whether that date was within two years from the date of any tortious act or negligent omission of defendants—alleged in plaintiff's petition, and supported by evidence, and within the scope of the jury's special findings—will require careful consideration as we proceed. Counsel for plaintiff discern no difficulty about this point. They simply contend that defendants' tortious wrongdoing was of a continuous nature which lasted until defendants *turned plaintiff out of the hospital* in the early morning of September 22, 1933.

It will simplify this question of the relevancy of the statute of limitations if we lay it aside until we take careful notice of the specific allegations of wrongdoing charged in the petition, and of the question whether there was any substantial evidence to support them.

It was alleged that defendants' doctors placed plaintiff's leg in a cast with such negligence and lack of skill that the cast did not cover the portion of the femur which was fractured and did not permit the broken portions of the bone to unite. Defendants contend that this charge of negligence was not supported by any competent and substantial evidence, and that the jury's special finding of negligence exonerated defendants as to this particular charge. Touching the first of these points, there was no evidence that the work of placing a splint on the leg nor in placing the cast on it was negligently or unskillfully done. All the competent testimony was to the contrary. Because of the recent wound on the patient's tailbone and the recent wounds in her feet, a variation in the making of the splint and in applying it was necessary, but there was no evidence that such was not a good professional job under the circumstances. And as for the failure of the broken portions of the femur to unite, such a failure was shown by all the competent evidence (and none

to the contrary) to be quite common—in thirty-five to fifty percent of the cases—in patients of the age of plaintiff.

We also hold that the jury's special finding of negligence on which they based their verdict, finding No. 2, cannot be fairly construed to include the charge of negligence just discussed. It is, of course, elementary that when various and sundry charges of negligence are alleged in a damage suit, and the jury makes a special finding stating on what particular grounds of negligence they base their verdict, any and all allegations of negligence not mentioned nor fairly implied in the special findings are eliminated from the lawsuit. In *Brim v. Atchison, T. & S. F. Rly. Co.*, 136 Kan. 159, 12 P. 2d 715, the syllabus, in part, reads:

"Rule followed that in an action for damages on various allegations of negligence, where the jury makes a specific finding as to what particular act or acts of negligence defendant committed, such finding exonerates the defendant of all other charges of negligence alleged in plaintiffs' petition." (Syl. ¶ 1.)

The second charge of negligence was that after placing plaintiff's leg in the cast she was given no further treatment for five weeks. Certainly there was no evidence to support this charge and the jury's special findings of negligence exonerated defendants of it.

Touching the third charge of negligence, which was that the diathermic treatments were not given by a trained physician, and which also included that of ordering and permitting those treatments to be given by the employee, Roy Musick, who was neither trained as a physician nor as a nurse, there was ample evidence, however, that Musick had been specially trained to operate the diathermic machine and to give diathermic treatments, and no evidence to the contrary, so this charge of negligence failed for want of evidence. It also failed because the jury's special finding of negligence eliminated it.

Touching the fourth charge of negligence—the continued diathermic treatments for many weeks, which caused plaintiff to suffer much pain: Undoubtedly these diathermic treatments were given every day except Sundays. But there was no evidence that such treatments were improper, and no evidence that they could be given without causing pain. In short, no negligence or malpractice in the giving of these treatments was shown by competent evidence. In *Rainey v. Smith*, 109 Kan. 692, 694, 201 Pac. 1106, it was said:

"It is the rule in this state that negligence of a physician or surgeon must be proved by expert evidence. (*Sly v. Powell*, 87 Kan. 142, 123 Pac. 881; *Paulich v. Nipple*, 104 Kan. 801, 806, 180 Pac. 771.)"

See, also, *Stockham v. Hall,* 145 Kan. 291, 65 P. 2d 348, and citations.

There was no evidence to support that phase of this same charge of negligence that defendants had failed to further investigate the fracture until September 21, 1933. There was no evidence that an X ray was taken on that date, nor that the fracture had been irritated by the diathermic treatments. Nor was there any evidence that defendants failed to treat plaintiff with the degree of care and skill prevalent among hospitals and doctors in the vicinity, nor that a proper degree of care and skill would have caused the fracture to unite within a short time. On the contrary, the professional testimony on that point was as follows:

Dr. M. E. Pusitz, called as a witness for plaintiff, testified:

"There is no guarantee that any method in medicine will give a cure. . . . I have also found that in fractures of the neck of the femur that no matter what treatment is given, it is impossible to obtain a union of those fragments. In a larger percentage of cases I am unable to obtain such a union in persons over fifty-five than in persons under fifty-five. In my experience, in persons over the age of .fifty-five, no bony union is obtained by the original treatment in thirty-five percent of the cases. . . . I have specialized in orthopedic surgery, and it is generally conceded among the profession that a person who specializes in orthopedic surgery is qualified to do and knows things that .come within the range of orthopedic surgery, and does things differently from the ordinary surgeon."

Dr. W. M. Mills, called as a witness for defendants, testified:

"I have an opinion about fractures in people who are ordinarily from fifty on up; I think the percent where no bony union is obtained runs thirty-five to fifty. . . . I testified that it was my opinion that thirty-five percent did not obtain a bony union. That was based on all ages. The majority of those cases are in connection with patients of fifty years and over. The percentage of recovery would be greater in a person of fifty years than if they were older. If a person were fifty-six years old, her chances would be better than at sixty-five or seventy-five; she would have better than a thirty-five percent chance."

Dr. R. B. Stewart, called as a witness for defendants, testified:

"I can't give exact figures of the percentage of cases in which a bony union is obtained in cases of subcapital fractures of the femur by any original treatment of such fracture, where the injury occurs in persons approximately fifty-six years of age; but there are a considerable number in which a non-union exists; it might be from twenty to fifty percent, depending on the age and the variety of the fracture; I would say somewhere from thirty-five to fifty percent."

There was no evidence that it was unprofessional, negligent or wrongful in this case (or in any case) for a physician to conceal

from his patient her condition; nor was there evidence that some other treatment than that plaintiff was receiving would have been proper or advisable. Defendants' evidence was that her physical condition was so poor that she was in no shape to undergo the ordeal of some other treatment commonly given to restore a broken femur when the first treatment fails. Of course, the jury had the privilege of discrediting and disbelieving that evidence, but plaintiff's own evidence was to the same effect. The day she left the hospital she went to the home of her sister in Illinois. Next day she put herself under the care of a doctor. She testified:

"The next day I consulted a physician by the name of Doctor Stanford. I was in Illiopolis three months. He gave me a building-up treatment to speed up my physical condition. Doctor Stanford was my physician while I was there."

After that three months of physical building up, on December 21, 1933, she went to her son's home in Iowa. She testified:

"There I consulted a physician named Doctor Martindale; he continued the same treatment. I was under his treatment about a month. He didn't make a thorough examination of my hip; he gave his opinion. A little later I went for an X ray at Fort Dodge, to a Doctor Noll."

Then she went to Eagle Grove, Iowa. Her testimony continues:

"I then went to consult the family physician in Eagle Grove, Doctor Morris. He was the family physician of my daughter's family in Eagle Grove. He made a careful examination, and read the report. I just had one conference with him, that is the time he made the examination and read the report. After my conference with Doctor Morris, I decided to go to Iowa City. I didn't consult any physician before I went to Iowa City. I went to the orthopedic clinic under the charge of Doctor Steinler in connection with the University Hospital in Iowa City. I went there on the advice of Doctor Morris, and also from the fact that he got me in there as a cost patient. I went there the first part of February, 1934. . . . Then I was sent for a physical examination to another part of the hospital Saturday afternoon, and on Monday morning they operated on me. One of Doctor Steinler's staff, Doctor Kalosky, operated on me. The operation was a Whitman's reconstruction of the hip. I can't tell what was done. That operation was performed the latter part of February."

It will thus be seen that it was not until plaintiff had received five months of treatment to build up her strength, under the ministrations of half a dozen doctors of her own choosing, Stanford, Martindale, Noll, Morris, Steinler and Kalosky, that she was deemed in fit condition to undergo another and different operation to attempt a restoration of her broken femur. So plaintiff's charge of negligence for defendants' failure to promptly apply a different treat-

ment when defendants' doctors discovered that the first treatment was unsuccessful was completely demolished—for want of evidence to support it and by evidence to the contrary supplied by plaintiff herself.

Touching the charge that defendants turned plaintiff out of the hospital, and the jury's special findings Nos. 5 and 6 that she was requested or directed to leave the hospital by Doctors Boykin and Hiebert, defendants contend that there was not a syllable of evidence to support that charge or to justify the jury's findings Nos. 5 and 6. To meet that contention plaintiff quotes an excerpt of her testimony which reads:

"From the time the cast was taken off my leg, some time the middle of June, and up until the 11th of September, the day I went to the clinic, no X-ray picture had been taken of my leg. . . . Before the X ray was made in September, I asked Doctor Hiebert if I could come to the clinic and see my picture. The next morning I went and saw one picture. . . . I asked him what he thought about my remaining any longer, or whether it could be possible for me to leave and go to my sister's in Illiopolis; and of course, I knew my condition wasn't good and I wasn't hardly fit for a long trip, and I asked him what he thought, and he said right away: 'Yes. The hospital has done all they can for you, and they have kept you much longer than they should have.'"

Elsewhere plaintiff testified:

"*The conversation I had with the doctors didn't cause me to leave the hospital so much as several other things.*" [Italics ours.]

Manifestly the most elementary principles of justice should compel a court to hold that this testimony did not support the charge that defendants or any of them turned the plaintiff out of the hospital on the morning of September 22, 1933.

We have already considered the charge of negligence based on the alleged incompetency of the attendant, Roy Musick, and found it completely unsupported by evidence. There was no competent evidence that Musick's diathermic treatments and hand manipulative treatments caused injury and damage to plaintiff. Moreover, a careful perusal of the jury's special findings reveals that the jury did not predicate its verdict on any incompetency of Musick to administer these treatments. The pertinent special findings of negligence and malpractice were these: Allowed and aided activities not properly supervised after removal of fixation cast—such as the use of crutches, in and out of wheel chair, and failure to keep proper check of the patient's progress or lack of progress. None of these

are even remotely related to the diathermic treatments given by Roy Musick.

The final charge of negligence included in plaintiff's amended petition relates to the alleged incompetence of Doctor Hiebert and Doctor Boykin to treat and superintend the medical treatment of plaintiff, which the defendant associations well knew when they were employed, whereby both of defendant associations were guilty of gross, wanton and willful negligence, which negligence was a directly proximate cause of the damage to plaintiff.

This charge of negligence was not sustained by the evidence. On the contrary, although the burden was not on defendants, they introduced a plethora of evidence tending to show the thoroughness of the investigation made by the responsible officials of the hospital association touching the qualifications of training and practical experience of Doctors Hiebert and Boykin before they were employed. Moreover, this charge of negligence was not included in the jury's special findings of negligence upon which their verdict was based.

It will thus be seen that the charges of negligence and malpractice alleged in plaintiff's petition either failed for want of evidence or were eliminated by the specific findings of negligence on which the jury based its verdict.

And as to the special findings which the jury did make, there was no competent evidence to support special finding No. 2.

In finding No. 3, the jury disbelieved the testimony of the defendant doctors that plaintiff was not suffering from sciatic neuritis at the time the cast was removed. This, of course, was the jury's privilege, and apparently was based on the fact that the daily progress sheets and nurses' charts did not record that particular affliction. But the special question to the jury itself took cognizance that at the time of the removal of the cast she was suffering not only from the fracture of the femur but also from the previous operations—on her coccyx and for her bunions. Whether the operation for the gall bladder also distressed the plaintiff does not appear. Plaintiff's daughter-in-law testified as to her suffering:

"I arrived at the hospital within a week after she fell out of bed; I remained there five weeks. She was in bed when I came. The cast that was on her legs had braces that went down and held the legs perfectly straight. At first she was lying on her back, when I got there. I visited her about three times every day while I was in Topeka; we talked and I tried to make her comfortable. I was still at the hospital when the cast was taken off, which was about a week before I left. The cast had been cut out in places. I had

had a talk with Doctor Hiebert in regard to the changes in the cast, a little while after I came. I told him that it hurt her, and she complained of it hurting so much, and I asked him if there wasn't something that could be done. He said he would see."

Plaintiff herself testified:

"I was in the cast five weeks. During that time there was nothing more to do to my hip; I was suffering both pain and discomfort, and also suffering from the wound in my back."

In view of the foregoing this court holds that it is unnecessary to consider the many other specifications of error urged by defendants, including the sharply debatable question touching the hospital's claim to be a charitable institution. We are all agreed that the judgment must be reversed and judgment ordered for defendants. Some of the justices hold the view that what we have already said effectively disposes of this appeal; but some of us, including the writer, also hold the view that the statute of limitations was a complete bar to this action. Passing the question whether the cause of action pleaded in the amended petition which was filed on January 15, 1936, was so related to the cause of action stated in the first petition filed on September 20, 1935, that the action pleaded in the amended petition should be deemed commenced as of the date the first petition was filed, it seems clear in any event that the bar of the statute had fallen before September 20, 1935. Plaintiff argues that the alleged wrongdoing if proven continued until plaintiff was turned out of the hospital on the request or direction of defendants' doctors on the morning of September 22, 1933. As we have seen, however, no such incident occurred. She left the hospital because Doctor Hiebert told her she could go and because, as she testified, there were "several other things" that caused her to leave which she did not choose to disclose. No request or direction to her to leave the hospital was given by either of the defendants, and the record contains not one syllable of evidence to support that charge or the special finding of the jury.

As a clincher to prove that the proper treatment had not been given her in the hospital, plaintiff testified that on the day following the taking of the last X ray, about September 11, Doctor Hiebert ordered a change in the treatment. She testified:

"An X-ray picture was made that afternoon [September 11]. The next morning the doctor came and he seemed very concerned and said, 'Don't bear any weight on that leg.' I says, 'Why?' He said, 'It isn't doing as it should; it isn't healing as it should.' . . . That morning was the first time that

Doctor Hiebert told me not to place any weight on that leg since he told me to place weight on it; he had told me to place weight on it before. He said, 'Does the treatment still cause you great pain?' and I said, 'Yes,' and he said, 'We had better discontinue them.' "

If this testimony were susceptible of an admission by Doctor Hiebert of his negligence, or if it were evidence sufficient to make a prima facie case of negligence, it shows that such treatment was ended on September 12, which was two years and eight days before this action was begun. On the concluding page of her brief plaintiff's counsel say:.

"Even Doctor Boykin, one of the defendants, testified that it would not be proper to move the hip when there is just a fibrous union of the fracture, and that is all there ever was in this case."

This frank statement certainly simplifies this long record to which we have devoted much time and study.

The judgment is reversed, and the cause remanded with instructions to enter judgment for defendants.

HOCH, J., did not participate.

Mr. Justice HUTCHISON sat with the court when this appeal was argued, and participated in the consultation and in reaching this decision, but retired from the court before the opinion was prepared.