No. 34,474

E. B. Pierce, *Appellant,* v. E. S. Edgerton, *Appellee.*

(98 P. 2d 129)

Opinion filed January 27, 1940.

*Clarence R. Sowers* and *Claude E. Sowers,* both of Wichita, for the appellant.

*Glenn Porter, Getto McDonald, Dwight S. Wallace, William Tinker, Paul J. Wall, Carl I. Winsor* and *John E. Boyer,* all of Wichita, for the appellee.

The opinion of the court was delivered by

WEDELL, J.: This was an action for damages for malpractice. Plaintiff has appealed from an order sustaining a demurrer to his evidence.

The negligence and the consequences thereof, as alleged, were as follows:

"That on the 24th day of October, 1937, this plaintiff suffered a right traumatic direct inguinal hernia, and on the 25th day of October, 1937, the defendant herein, holding himself out as a surgeon to this plaintiff, the plaintiff employed defendant at his request as such surgeon, to operate and cure said hernia and to attend this plaintiff until he should be cured, and pursuant to said employment, the defendant did operate upon this plaintiff for said hernia, but did so negligently and unskillfully and without the proper degree of care, diligence and learning, in this: *That the defendant did sever and strangulate the plaintiff's right spermatic cord and did cause it to cease to function, and did so negligently and carelessly operate on the plaintiff that the cord became strangulated and bound down adhered to the adjacent tissue of the cord,* and by reason thereof, caused the plaintiff's right testicle to atrophy and become inert, pass away and become damaged permanently, and that said physical condition is deteriorating to this extent; that the plaintiff's left testicle has become inflamed and [he] suffers loss of sexual activity. That the plaintiff was working as a driller and tool dresser and required to perform heavy manual labor, and that as a direct, controlling and proximate result of the aforesaid operation, the plaintiff has been, and is now, in such a weakened physical condition he has been and is unable to pursue his duties as a driller and tool dresser.

"That all of the foregoing negligent and unskillful acts on the part of this defendant in said operation are the direct, proximate and controlling cause of this plaintiff's injury, and that as a result thereof this plaintiff is now in a state of impotency and has, as a result thereof, lost all sexual desire and hope thereof, and as a result of which the plaintiff is suffering great physical and mental pain and anguish and as a result of said acts of this defendant, the defendant is indebted to this plaintiff in the sum of fifteen thousand dollars ($15,000)." (Italics ours.)

The evidence in behalf of plaintiff was in substance as follows: Plaintiff lived at Russell, and was employed as a driller by the Bison Drilling Company. On August 24, 1937, while turning on the steam of a generator which operated the lights, the head of the generator blew off and struck plaintiff in the abdomen and legs. The head of the generator, which was made of cast iron, was about fourteen inches in diameter and about one-fourth of an inch thick. As a

result of the accident plaintiff's skin turned black from his navel to his knees. There was 140 pounds of steam on at the particular time and plaintiff was knocked back against the boiler about eight feet away. The main artery in one leg was ruptured and plaintiff crawled away from the boiler and lay on the ground until the tool dresser returned in about twenty minutes. He was taken to the hospital at Hays, and was there treated by a physician and surgeon for about two weeks. His left hip was out of place, and that was adjusted while in the hospital at Hays. In October, 1937, he came to Wichita to interview the defendant, Doctor Edgerton, and engaged defendant to operate upon him for a direct right inguinal hernia which resulted from the blow he had received. Plaintiff was given an abdominal belt to wear and was advised to return when the soreness in the abdominal region subsided. He returned at the end of about two weeks and the operation was performed at the Wichita hospital. The evidence adduced on behalf of plaintiff was in conflict as to whether both testicles were normal as to size prior to the operation. Plaintiff testified they were the same size before the operation. The defendant, whom plaintiff called as his own witness, testified they were not the same size. Following the operation he had a severe pain in his back. The pain continued until drainage started in his side about two weeks after the operation. About two weeks after the operation his right testicle had become reduced to about one-half its normal size, and was very hard. Plaintiff was a strong, healthy man, fifty-six years of age, and had never suffered from headaches prior to the operation. Following the operation he suffered severe attacks of headache, with pain originating in his back and running up his spine, neck and the back of his head. Doctor Edgerton did not see him often or examine him after the operation and while plaintiff was in the hospital. After he left the hospital he went to defendant's office every day to have the incision dressed. The drain in his side was about the size of a lead pencil.

The only expert testimony adduced by plaintiff to establish the negligence charged was that of the defendant, Doctor Edgerton, whom plaintiff, as stated, called as his own witness. The doctor's testimony, in substance, was:

"I am a physician and surgeon and have been since 1910 and have specialized in general surgery. I am the defendant in this case and operated upon E. B. Pierce on the 25th of October, 1937. The incision was made through the skin down to the muscular layers of the abdominal wall; the structures were

identified; the outer muscular layer was cut through to expose the inguinal canal and its contents. The important content of the inguinal canal is the spermatic cord. I found a hernia, a protrusion through the inner muscular layer. It was a direct type of hernia or rupture. It was a different type hernia than the so-called indirect hernia. The indirect hernia is very closely associated with the structure of the cord. The direct hernia, which this man had, was not so closely associated with the cord itself. Having bared the covering of the sac that was protruding from the inside, this sac was opened and the contents pushed back in the abdominal cavity where they belong. The sac itself was tied off and closed off and the redundant part of the sac removed. Then to repair the weak place in the abdominal wall so that there would be no further recurrence, the muscles were sewed together and overlapped to build up a barrier at the site of this weak place. *There was nothing to this repair that would damage this man's cord or testicle;* however, at the time of this operation this man's testicle was noted to be smaller than normal. It was not as small then as it was later in June of the following year or July of the following year when I examined him. We examined the testicle as a part of the procedure. The cord was transplanted outside of these muscles as a part of the operation. We merely lift the cord up and bring the muscles together underneath so that it lies on top and not pressed upon by muscles. I am familiar with the ordinary care and skill and diligence and learning used by physicians and surgeons in good standing in the city of Wichita and like communities. It is possible that a spermatic cord might become strangulated in an operation—that is an exception rather than the rule. The only way that strangulation could occur upon the cord would be in a case in which the cord actually made up a part of the hernia itself, and it was necessary in order to repair the hernia to do a piece of work that might involve the cord as a part of the sac itself, and in handling that it is possible that it might become cut too deeply in the repair. Assuming that this was done, the blood supply to that organ would be interfered with and it would eventually result in atrophy or a shrinking. It would take considerable time for that to occur but it would occur. *In my opinion the atrophy and shrinking of the right testicle of this plaintiff was not caused by a strangulation of the right spermatic cord.* If you assume that the spermatic cord had been strangulated, then it might be due to that. Assuming that a man's right testicle did become atrophied, it should not have any effect upon his ability to work or his ambition to commit sexual intercourse. I think the reason for the drainage was because the suture material failed adequately to absorb. We used cat gut, which is absorbable suture material, and use this in the deeper structures where it does not require removal later. This is in contrast to the type we use in suturing the skin, because that is to be removed later. We don't like to have this condition happen, referring to the draining, but it does happen; it is not serious and requires dressing for some time. At the time of the draining, the hole was about the size of a lead pencil, but it was not flowing freely. It had very little stench. *In a repair of a direct hernia such as this, the spermatic cord would not become strangulated.* The direct hernia is a hernia in which we are repairing away from the spermatic cord. It is necessary to adjust the spermatic cord in

,an indirect type, but that is not interferred with in the repair of a direct hernia. *In the repair of a direct hernia, this cord is simply carried to one side and held apart, it is out of the field of operation, and is not in danger of injury. I sutured the muscles but not in the way to compromise the cord in any way.* The atrophied condition of the right testicle of this man did not contribute anything to headaches.

"I have performed between seven and eight hundred hernia operations in Sedgwick county, Kansas. In performing this operation on Mr. Pierce, I followed the usually accepted procedure used by physicians and surgeons in the city of Wichita. Nothing happened at all out of the way during the operation." (Italics ours.)

Plaintiff's wife testified concerning the change in her husband's physical condition and that their sexual relations after the operation were not normal and that the drainage had a terrible odor. Plaintiff testified he was unable to have sexual relations since the operation.

It is elementary that on demurrer the evidence challenged must be given full credence and all reasonable inferences to be drawn therefrom must be construed in the light most favorable to the party adducing it (*Hill v. Southern Kansas Stage Lines Co.*, 143 Kan. 44, 53 P. 2d 923), and that only such evidence is considered as is favorable to the party adducing it. (*Meneley v. Montgomery*, 145 Kan. 109, 64 P. 2d 550; *State v. Linville*, 150 Kan. 617, 618, 95 P. 2d 332.)

It will serve no useful purpose in the instant case to narrate additional testimony. The evidence has been carefully reviewed and considered. Giving plaintiff the strongest possible benefit of the above rules, we simply are unable to find any evidence to support the negligence charged. The most that can be said is that if the operation had been negligently performed, as charged, the injury claimed could have, or might have, resulted from the operation. That, of course, did not constitute proof of negligence. In *Updegraff v. Gage-Hall Clinic*, 125 Kan. 518, 521, 264 Pac. 1078, it was said:

" 'What is the proper treatment to be used in a particular case is a medical question to be testified to by physicians, as expert witnesses; laymen, even jurors and courts, are not permitted to say what is the proper treatment for a disease or how a specific surgical operation should be handled.' (*James v. Grigsby*, 114 Kan. 627, 632, 220 Pac. 267.)

" 'This evidence must, from the very nature of the case, come from experts, as other witnesses are not competent to give it, nor are juries supposed to be conversant with what is peculiar to the science and practice of the professions of medicine and surgery to that degree which will enable them to dispense with all explanations.' (*Tefft v. Wilcox*, 6 Kan. 46, 59.)

"This court, in *Pettigrew v. Lewis,* 46 Kan. 78, 26 Pac. 458, quoted from McClelland, Civil Malpractice, p. 304, as follows:

" 'The question whether a surgical operation has been unskillfully performed or not is one of science, and is to be determined by the testimony of skillful surgeons as to their opinion, founded either wholly on an examination of the part operated upon, or partly on such examination and partly on information derived from the patient; or partly on such examination, partly on such information, and partly on facts conceded or proved at the trial.' (p. 81; See, also, *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881.)" (p. 521.) See, also, *Flentie v. Townsend,* 139 Kan. 82, 30 P. 2d 132, and *Blackburn v. Security Benefit Ass'n,* 149 Kan. 89, 98, 86 P. 2d 536.

In *Saylor v. Brady,* 114 Kan. 764, 220 P. 2d 1047, a case in which plaintiff offered no expert testimony, this court, after reviewing the authorities, remarked:

"In *Pettigrew v. Lewis,* supra, it was said: 'Cases may arise where there is such gross negligence and want of skill in performing an operation as to dispense with the testimony of professional witnesses.' (p. 81.) If, in performing a surgical operation, a metallic spring twelve inches long were sewed up in the abdomen (*Wharton v. Warner,* 75 Wash. 470), or a jawbone broken in pulling a tooth was given no treatment of any kind (*Eichholz v. Poe et al.,* 217 S. W. 282 [Mo.]), perhaps medical evidence would not be necessary to show negligence, but we have no such situation here." (p. 765.)

What was said in the foregoing cases applies with equal force in the instant case. Negligence is never presumed, but must always be established. Until it is established by some competent evidence, a jury has no function to perform. The expert testimony of the defendant did not establish the negligence charged, but refuted it. There was no other testimony to substantiate, or which tended to substantiate, the alleged negligence. The trial court ruled properly when it sustained the demurrer to plaintiff's evidence and rendered judgment in favor of defendant. The judgment is affirmed.